141 N.J. Super. 437 (1976)
358 A.2d 805
JOSEPH J. SANDLER AND LAWN-A-MAT OF PENN-JERSEY, INC., PLAINTIFFS-RESPONDENTS,
v.
LAWN-A-MAT CHEMICAL & EQUIPMENT CORP., ET AL., DEFENDANTS-APPELLANTS,
v.
HANNAH SANDLER, ET AL., THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 13, 1976.
Decided May 10, 1976.
*441 Before Judges LYNCH, LARNER and HORN.
Mr. Harold Friedman argued the cause for defendants-appellants (Messrs. Kirsten, Solomon, Friedman & Cherin, attorneys; Mr. Jack B. Kirsten and Mr. Harold Friedman on the brief).
Mr. Morris M. Schnitzer argued the cause for plaintiffs-respondents and third-party defendants (Messrs. Schnitzer and Schnitzer, attorneys).
The opinion of the court was delivered by LARNER, J.A.D.
Defendant Lawn-A-Mat Chemical & Equipment Corp. (Lawn-A-Mat) established a business based on a method of promoting sales of lawn care products consisting of seed, fertilizer and chemicals through a combination machine which could apply these products and aerate a lawn in one operation. The incentive to the consumer was keyed to the sales approach that the lawn would be rolled and aerated free of charge as it was fed with the purchased ingredients. Lawn-A-Mat did not sell directly to consumers but conducted its business through a two-tier network of franchisees consisting of distributors and dealers. The dealers dealt directly with the purchasing public and performed the services, whereas the distributors acted as the *442 middlemen between Lawn-A-Mat and the dealers by providing the lawn supplies and requisite training and assistance.
Dealers paid license and royalty fees to Lawn-A-Mat for the franchise, benefits of management assistance, use of the trade name and national advertising. Distributors derived their income from an override profit on the products purchased from Lawn-A-Mat for sale to the dealers and a percentage of the franchise fees paid by the dealers.
In 1963 Joseph J. Sandler became both a Lawn-A-Mat distributor and dealer. He entered into distributor agreements for exclusive territories in portions of Pennsylvania and New Jersey and Rockland County, New York. In addition, he undertook dealership franchises in Pennsylvania and New Jersey. His enterprise grew and prospered with development of new dealerships so that sales skyrocketed from $78,000 in 1963 to $670,000 in 1967. In building his business Sandler also created subdistributorships although his distributor franchise with Lawn-A-Mat did not specifically authorize the same. Among these were five subdistributorships created by Sandler which became a substantial focus of controversy between the parties to this litigation and resulted in further adjustments in their financial relationship. The evidence at trial relating to the understanding as to the respective benefits to be derived from these five distributorships was in sharp conflict.
In any event, on May 12, 1967 the parties entered into a new arrangement under a "Master Distributor Agreement" which designated Sandler as a master distributor with an exclusive license in the designated territory to offer and sell franchises to dealers and distributors for a period of 50 years with an option to renew for another 50 years. The agreement provided for the financial participation of both parties in the franchise fees of dealers and the proceeds received by distributors from the sale of franchises. It also set forth the duties of Sandler as Master Distributor in promoting the sales and establishment of distributorships and dealerships. In addition, Sandler agreed to devote his "full *443 time and attention to the business" and covenanted that he would not engage in any business in direct or indirect competition with Lawn-A-Mat or the master distributor.
With the consent of Lawn-A-Mat Sandler assigned the Master Distributor Contract to a newly formed corporation known as Lawn-A-Mat of Penn-Jersey, Inc. (Penn-Jersey). The new corporation continued to prosper under the new contract so that its sales volume nearly doubled between 1967 and 1970. However, during these years many disputes arose between the parties in the implementation of the contract.
The major breach in their relations occurred in 1968 when Sandler, who had been instrumental in building up the business of Lawn-A-Mat, sought to acquire 30,000 shares of stock from David Dorfman, the president of the company, in return for his successful sales efforts. Around this time Dorfman suffered a heart attack, and Sandler continued pressing for a stock interest in the company. However, Dorfman apparently did not agree to such a stock participation by Sandler. A suit instituted by Sandler in February 1969 to specifically enforce such an alleged agreement resulted in a judgment in favor of Dorfman in December 1969.
This litigation and the friction which developed produced a severe deterioration in the relationship between Sandler and Dorfman. On July 8, 1969 Lawn-A-Mat dispatched a letter to Penn-Jersey in which it pointed out that it refused to make further regular monthly payments to Penn-Jersey for moneys due on the five distributorships created prior to Master Distributor Agreement because Penn-Jersey had failed to remit the proportionate share of franchise fees due to these distributors. The letter also threatened to terminate the agreement between the two companies unless Penn-Jersey complied with its obligation to remit the appropriate payment due to these distributors. Sandler's testimony at trial denied that there was any breach in this connection and posited that the moneys due to these distributors *444 had been credited to them toward moneys due to Penn-Jersey in accordance with their standard practice.
Efforts to settle all these problems proved fruitless and the relationship worsened. After October 30, 1969 Lawn-A-Mat discontinued making payments to Penn-Jersey for its share of the fees remitted by distributors and dealers.
In February 1970 Lawn-A-Mat asserted that Penn-Jersey was not properly performing its advertising function in its capacity as master distributor. This assertion was disputed by Sandler and he convened a meeting of dealers to discuss the advertising budget and the determination of the media to be utilized for advertising. Lawn-A-Mat was advised of these activities and the decisions which had been made at the meeting. In March 1970 Lawn-A-Mat refused to supply chemicals or seed to Penn-Jersey, and finally on March 16 Lawn-A-Mat "suspended" Penn-Jersey as a master distributor, notified the dealers of this action and instructed them to deal directly with it instead of Penn-Jersey.
On May 20, 1970 Penn-Jersey filed a complaint for declaratory judgment seeking specific performance of the Master Distributor Agreement and particularly requesting a declaration that Lawn-A-Mat was obligated to supply seed and chemicals or, in the alternative, that Penn-Jersey could obtain like products from others and distribute them to its dealers and distributors. At the same time it circulated the complaint to the dealers and distributors and convened a meeting of these franchisees for May 27, 1970. The minutes prepared by Sandler stated that the purpose of the meeting "was to clear the air of all the vicious charges being made against me by the President of Lawn-A-Mat to prove once and for all that Mr. Dorfman by his own admission is an unmitigated liar and to explain the intent of my law suit against the company." In response to the calling of this meeting, Lawn-A-Mat forwarded a notice to Sandler terminating the Master Distributor Agreement because of breaches alleged in the letter, which included: arrears in payments *445 to dealers and distributors, instructions to them to purchase chemicals from others, advocating that franchise fees be paid directly to Penn-Jersey, acting in competition with the company in the sale of chemicals and withholding of payment of franchise fees collected from five dealers. An exchange of self-serving letters to and from the respective parties and attorneys failed to resolve their differences and the termination became finalized by its terms on June 28, 1970.
At the aforesaid meeting of dealers and distributors on May 27 Sandler addressed the group, reviewing the subject matter in controversy between them and accusing Dorfman of lying. He also advised that he had arranged for the purchase of identical chemicals from another supplier at a reduced price. He asked the persons present to stand at his side "in this battle for our business." He further noted that some of the dealers had stopped paying their franchise fees altogether. It was Sandler's version that he instructed the dealers to pay these fees in any event either to Lawn-A-Mat or to him. Other witnesses at the meeting testified that Sandler requested that the fees be paid only to him.

I
The foregoing represents a bare outline of the operative facts in the course of dealing between the parties. In light of our view as to the factual determination by the trial judge on the issue of liability, it is unnecessary to delve further into the lengthy presentation of testimonial and documentary evidence in the record. Suffice it to say that the trial record depicts highly disputed versions as to the identification of the party who breached the contract.
It should be noted that amended pleadings were filed during this litigation which transformed the case into an action by Penn-Jersey against Lawn-A-Mat for damages for its alleged breach of contract, and a counterclaim by Lawn-A-Mat for damages and injunctive relief against Penn-Jersey *446 on an allegation of a breach of contract and tortious interference with contracts and unfair competition. Lawn-A-Mat also sought judgment on several counts for moneys due from Penn-Jersey for chemicals and improperly collected franchise fees, and for moneys due from Sandler individually and members of his family pursuant to an arbitration award.
The trial judge in an oral opinion concluded that Lawn-A-Mat breached the contract between the parties. He determined that the suspension and termination of the Master Distributor Agreement were not justified and that as a consequence Lawn-A-Mat was guilty of the breach rather than Sandler or Penn-Jersey. He also found that the unjustified termination by Lawn-A-Mat excused further adherence to the contract by Penn-Jersey and that Penn-Jersey's actions as a consequence did not give rise to a claim for damages or other relief on the allegations of Lawn-A-Mat's counterclaim. Judgment was entered in favor of Penn-Jersey for compensatory damages in the sum of $45,000 and punitive damages amounting to $30,000. By way of offset, judgment was entered on the counterclaim arising out of Lawn-A-Mat's money claims in the total sum of $28,338.34, resulting in a net judgment in favor of Penn-Jersey for $46,661.66.[1]
It is significant that a major underpinning of the trial judge's factual findings is the credibility factor in weighing the divergent testimony offered by the two protagonists and the inferences to be drawn from the documentary evidence in the record. The judge pointed out:
On the whole, I thought Mr. Sandler's testimony was forthright and direct. I think Mr. Dorfman's testimony was not so, although I am not pointing out that Mr. Dorfman deliberately said anything to me that wasn't so. It is just the impression I have as the trier *447 of fact that considering the testimony and the demeanor of the gentlemen involved from the Bench, Mr. Sandler's testimony came through to me somewhat clearer than Mr. Dorfman's testimony.
Such a base for decision effectively bars an excursion by this appellate tribunal into the realm of independent fact findings. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974); State v. Johnson, 42 N.J. 146, 162 (1964); New Jersey Turnpike Auth. v. Sisselman, 106 N.J. Super. 358 (App. Div.), certif. den. 54 N.J. 565 (1969). See also, Brochin and Sandler, "Appellate Review of Facts in New Jersey, Jury and Non Jury Cases," 12 Rutgers L. Rev. 482, 484 (1958). Within the ambit of our appropriate function we are satisfied that the record presents adequate credible evidence which reasonably supports the fact findings reached by the trial judge on the issue of liability.
Appellate deference to the findings below is particularly warranted in this case where there were many areas of conflicting testimony leading to differing inferences and subtle nuances pertaining to a complex relationship over many years which required careful sifting and weighing by a judge who saw and heard the witnesses and was in a position to acquire a "feel" of the case.

II
We next turn to the issue of damages, considering first the award of punitive damages.
As noted, the trial judge awarded to Penn-Jersey punitive damages in the sum of $30,000. In support of this damage award the court found:
I cannot conclude with any degree of certainty that Lawn-A-Mat Chemical & Equipment Company will continue to be a viable and profitable enterprise over the next 50 or 100 years, which was the projected life of the master distributorship contract. I do know that for the three intervening years since the termination of the master distributorship contract that Lawn-A-Mat Chemical & Equipment Corporation has continued to be a viable enterprise and that its business in the area formerly covered by the master distributorship *448 continues to be substantial. I, therefore, have arrived at the conclusion that there should be an award of punitive damages as well as compensatory damages.
Insofar as the punitive damages is concerned, I have concluded, as I indicated, that the reasons assigned for the termination were not substantial but merely a continuation of the downhill relationship of the parties which had as its view the termination. I am motivated by the fact that the company apart from Mr. Dorfman, intended and wanted to avail to itself the proceeds of this very profitable master distributorship contract.
It is difficult to fathom from this explication whether the judge awarded punitive damages because of the difficulty encountered in calculating compensatory damages or whether he imposed the penalty because of malicious acts of Lawn-A-Mat and its agents.
If the sole rationale for the punitive damage award was the difficulty in assessing appropriate compensatory damages, the result is clearly erroneous. If the underlying rationale is based upon an implied finding of malice, we also conclude that the imposition of punitive damages was unwarranted in the context of the facts and issues in this case.
Punitive or exemplary damages have traditionally been reserved for civil wrongs characterized as torts. Note, "Exemplary Damages in the Law of Torts," 70 Harv. L. Rev. 517 (1957). Such damages are intended to punish the tortfeasor and prevent him from repeating such conduct. Cabakov v. Thatcher, 37 N.J. Super. 249 (App. Div. 1955). See also, McCormick, Damages, § 77 (1935).
In order to recover punitive damages a plaintiff must establish "actual malice, which is nothing more or less than intentional wrongdoing  an evil-minded act * * * or an act accompanied by a wanton and wilful disregard of the rights of another." La Bruno v. Lawrence, 64 N.J. Super. 570, 575 (App. Div. 1960), certif. den. 34 N.J. 323 (1961). See also, Di Giovanni v. Pessel, 55 N.J. 188 (1970); Berg v. Reaction Motors Div., 37 N.J. 396 (1962). Mere negligence is not sufficient. Lo Rocco v. N.J. Mfrs. Ind. Ins. *449 Co., 82 N.J. Super. 323 (App. Div.), certif. den. 42 N.J. 144 (1964).
In the absence of exceptional circumstances dictated by the nature of the relationship between the parties or the duty imposed upon the wrongdoer, the concept of punitive damages has not been permitted in litigation involving breach of a commercial contract. See Woody v. National Bank of Rocky Mount, 194 N.C. 549, 140 S.E. 150 (Sup. Ct. 1927); Lanigan v. Neely, 4 Cal. App. 760, 89 P. 441 (D. Ct. App. 1907); Brown v. Coates, 102 U.S. App. D.C. 300, 253 F.2d 36 (1958); 5 Corbin, Contracts, § 1077 (1964).
Where the essence of a cause of action is limited to a breach of such a contract, punitive damages are not appropriate regardless of the nature of the conduct constituting the breach. Professor McCormick has expressed this notion in the following fashion: "In actions, however, upon mere private contracts * * * even where the breach is malicious and unjustified, exemplary damages are not allowable." (Emphasis added). McCormick, Damages, § 81 at 286.
Several exceptions have been carved out to permit punitive damages in actions arising out of contract where the unusual relationship between the parties reflects a breach of trust beyond the mere breach of a commercial contract. For example, in states where an action for breach of contract of marriage is viable, punitive damages may be recovered. Lanigan v. Neely, supra. Similarly, an action against a public utility for failure to comply with its special statutory public duty, 5 Corbin, Contracts, § 1077 at 443, or an action by a depositor against his banker, Woody v. National Bank of Rocky Mount, supra, 5 Corbin, op., cit. § 1077 at 444, have been held to be in a class of exceptions to the general rule excluding recovery in contract actions. Other contractual litigation in which punitive damages are approved are those involving a fiduciary relationship such as an action by a seller against his real estate broker. Security Corp. v. Lehman Associates, Inc., 108 *450 N.J. Super. 137 (App. Div. 1970); Brown v. Coates, supra. See also Annotation, Right of principal to recover punitive damages for agents' or brokers' breach of duty, 67 A.L.R.2d 952 (1959).
An intermediate appellate court of California allowed exemplary damages in a case by an assured against an insurance carrier on the theory that a bad faith refusal to make payments under a disability policy accompanied by false and threatening communications "sounds in tort notwithstanding that it may also constitute a breach of contract." Fletcher v. Western National Life Ins. Co., 10 Cal. App.3d 276, 89 Cal. Rptr. 78, 93 (D. Ct. App. 1970). The court emphasized the "special duty to plaintiff of good faith and fair dealing" which an insurer owes an insured in reaching its conclusion. Fletcher v. Western National Life Ins. Co. supra, 89 Cal. Rptr. at 94. See also, Pennsylvania Threshermen & F. Mut. Cas. Ins. Co. v. Messenger, 181 Md. 295, 299, 29 A.2d 653, 656 (Ct. App. 1943). Contra, Eckenrode v. Life of America Ins. Co., 470 F.2d 1, 5 (7 Cir.1972); Diamond v. Mutual Life Ins. Co., 77 Misc.2d 528, 356 N.Y.S.2d 164 (Sup. Ct. 1974).
Penn-Jersey urges that the cause of action herein is equated with the tort of malicious interference with a contractual relationship where punitive damages may be appropriate. See Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 (E. & A. 1934); Louis Schlesinger Co. v. Rice, 4 N.J. 169 (1950); Kuzma v. Millinery Workers, etc., Local 24, 27 N.J. Super. 579, 592 (App. Div. 1953). We reject this thesis as inapplicable to the cause of action herein, where the claim is by one party against the other party to the contract and not against a third party interloper who has interfered with the contractual relationship. The latter claim is clearly a tortious wrong whereas the former is only contractual in nature. Prosser, Law of Torts (4 ed. 1972), § 129 at 934. See also, United States v. Newbury Mfg. Co., 36 F. Supp. 602, 605 (D. Mass. 1941).
*451 It is manifest that the within cause of action is based upon an allegation and a judicial finding of a breach of the Master Distributor Agreement by Lawn-A-Mat. The addition of such stylized labels as "malice" and "maliciously" in the pleadings and pretrial order do not transform the essence of the action into a tortious wrong. Regardless of these labels, plaintiffs' grievance is founded upon the breach of contract between the parties  a contract which creates no special relationship or duty beyond that arising out of any commercial transaction. As such, punitive damages are not recoverable against the breaching party.
We do not mean to conclude from the foregoing that the right to punitive damages should turn simply upon the form of action involved, namely, whether it is designated as a tort rather than a contract. There may arise a case involving such an aggravated set of facts that punitive damages might be appropriate regardless of the contract form of the cause of action and even though it may be beyond the scope of the recognized exceptions in the adjudicated cases. However, this is not such a case.
The record is replete with evidence of recurring disputes by both parties as to the interpretation of their relationship and their respective rights and obligations. As the trial judge noted, "the written agreement between these gentlemen did not chart the future course of their dealings but, to the contrary, they dealt with each other apart from the written agreement." As a consequence, it may be inferred that the positions espoused by each was not clearly justified or, in the converse, unjustified, by virtue of a finite duty spelled out by a clear-cut provision of their contract. Each position was undoubtedly taken because of self-serving motives encouraged by the nebulous nature of the agreement and relationship created by both sides.
The mere fact that a court has found that the weight of the evidence is balanced in favor of one side rather than the other, or that the motivation of the breaching party was *452 to advance his own interests and financial position, does not furnish the basis for a finding of the type of wrongful, malicious conduct which could support a claim for punitive damages even if the doctrine were extended to contract actions.
Our review of the record convinces us that the litigation herein was the result of a series of bona fide disputes with each party seeking the maximum benefit for his own interest, and that the facts do not warrant a finding of the malicious wrongful conduct which is a prerequisite to an award of punitive damages. Significantly, the final termination by Lawn-A-Mat was brought about by the advice of counsel  a factor negativing malicious intent. See McGlynn v. Schultz, 90 N.J. Super. 505, 519 (Ch. Div. 1966), aff'd 95 N.J. Super. 412 (App. Div.), certif. den. 50 N.J. 409 (1967); 70 Yale L.J. 978 (1961). In fact, the trial judge's oral opinion reflects a fact-finding analysis in a close case which resulted in an ultimate judgment in favor of Sandler's company on the basis of a resolution of conflicts in the testimony on material issues.
Such expressions in the court's opinion as: "I feel that the scale has tipped in his favor," "Mr. Sandler's testimony came through to me somewhat clearer than Mr. Dorfman's testimony," "Many actions that Mr. Sandler took during the course of the years could be interpreted as selfish actions motivated by self-interest and not in the best interests of the company," "I am not so sure that Mr. Dorfman was the bad actor here. I do not think that Mr. Dorfman should be painted in a bad light with respect to the deterioration of that relationship," "I have already indicated to you that Mr. Dorfman and Mr. Sandler did not hold sacred the written word," "I feel that the scales tip in the balance of Mr. Sandler," and "neither of them got where they are or got what they have from being nice guys,"  all point to the conclusion that the judge found much to be said on both sides of the controversy and that, although the termination *453 by Lawn-A-Mat was unjustified, it was not an act characteristic of the malice or ill-will which would warrant the imposition of the penalty of exemplary damages.

III
Lawn-A-Mat also attacks the award of compensatory damages on two grounds: (1) the evidence does not support with sufficient certainty the court's determination in the amount of $45,000, and (2) the doctrine of mitigation should apply so as to negate any actual damage.

A
In computing the amount of compensatory damages the trial judge recognized the absence of a degree of certainty which could be applied to the usual facts involved. This was particularly apparent because of the long term of the Master Distributor Agreement and the uncertainty of the future viability and productivity of Lawn-A-Mat. He therefore estimated to the best of his ability as a fact-finder that the annual net profit of Penn-Jersey from the activities encompassed by the agreement would have been approximately $15,000 a year on a conservative basis. He then proceeded to utilize the period of three years between the time of the breach and the time of decision as the finite period for admeasurement of the loss of profits and arrived at the conclusion of $45,000.
Although the articulated rationale for this conclusion is unique, we find that it is one within the broad discretion of the judge as the fact-finder and is warranted by the credible evidence in the record. The judge was not controlled by the four corners of the operating statements of Penn-Jersey. Although its records reflected no profits, the judge could properly look behind those statements to the other evidence in the case in order to arrive at a realistic factual picture of the profitable venture which was frustrated by Lawn-A-Mat's breach.
*454 Obviously, Lawn-A-Mat was found to be the wrongdoer who breached the contract. Presumptively this entitled Penn-Jersey to damages. Mere difficulty or lack of certainty in the proof or finding of the quantum of damages does not inhibit an award to the successful party. As noted by the Supreme Court in Tessmar v. Grosner, 23 N.J. 193 (1957):
If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient. Wolcott, Johnson & Co. v. Mount, 36 N.J.L. 262, 272 (Sup. Ct. 1873), affirmed 38 N.J.L. 496 (E. & A. 1875). The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. Oliver v. Autographic Register Co., 126 N.J. Eq. 18, 25 (Ch. 1939); Weiss v. Revenue Building & Loan Ass'n, supra [161 N.J.L. 208, 182 A. 891]; Wolcott, Johnson & Co. v. Mount, supra. [at 203]
Accord: Rubel & Jensen Corp. v. Rubel, 85 N.J. Super. 27, 41 (App. Div. 1964); Monaco v. Pepperidge Farms, Inc., 94 N.J. Super. 39, 42 (Ch. Div. 1967); McCormick, Evidence, § 26 at 99 et seq.; 5 Corbin, Contracts, § 1022 at 142. Doubts are resolved against the breaching party. Hodgson v. Applegate, 55 N.J. Super. 1, 17 (App. Div.), aff'd 31 N.J. 29 (1959).
We conclude that the trial judge's estimate herein has a reasonable basis in the record evidence and, although not exact, represents an appropriate and conservative result legally warranted by the particular circumstances of the case.

B
Finally, Lawn-A-Mat urges that the award of damages was not warranted because the profits lost by the contract breach were in fact mitigated by greater gains enjoyed by Sandler in another similar enterprise created when he was freed of the bonds of the Lawn-A-Mat contract. This argument is structured upon the evidence that sometime after the notice *455 of termination, Sandler discontinued operation of Penn-Jersey as a business entity and formed a new corporation, Lawn-King Inc., which proceeded to engage in the same business in competition with Lawn-A-Mat. This new venture was so successful that the monetary return in profits and salaries far exceeded that derived from the Penn-Jersey operation. Defendant contends, therefore, that the financial gains of Lawn-King, Inc. should be offset by way of mitigation to wipe out any basis for an affirmative damage award.
The trial judge rejected the mitigation argument on the ground that the earnings of Lawn-King, Inc. as an independent corporate entity could not be utilized to mitigate the damages of Penn-Jersey as a separate corporate entity. Lawn-A-Mat nevertheless urges that the corporate veils should be pierced and the issue be considered in light of Sandler's individual participation in both corporations.
Mitigation of damages is a doctrine applicable to breach of contract cases provided the factual complex permits its application and defendant sustains the burden of proof cast upon him as to actual or potential mitigation and the amount thereof. Roselle v. La Fera Contracting Co., 18 N.J. Super. 19, 28 (Ch. Div. 1952); McCormick, op. cit. § 33 at 130. The doctrine is particularly applicable to an employment contract wherein the discharge of a full-time employee frees him to earn moneys for his personal services. Under such circumstances his subsequent earnings during the period of the balance of the contract can be considered in reduction of the claimed damages.
In our opinion, the record in this case does not support defendant's claim of mitigation. In the first place, the contract in litigation was not a personal service contract. It was a commercial contract whereby Penn-Jersey, as assignee by consent, was granted a right to engage in the business of distributing the products of Lawn-A-Mat and selling dealerships and distributorships for the same purpose. Although the agreement as originally drawn provided that Sandler "agrees to devote his full time and attention to the *456 business of the master distributorship," this provision does not equate the relationship with an employer-employee contract. In practical effect, Penn-Jersey was involved in an independent business which could be administered by Sandler either alone or with other stockholders, officers, executives or employees.
Lawn-A-Mat's act of termination served as the cutting edge which severed the ties of Penn-Jersey to Lawn-A-Mat. Thereafter, Penn-Jersey had no affirmative duty to remain in business in order to mitigate the damages to which it might be entitled because of defendant's breach. It also had no nexus with Lawn-King, Inc., a new entity, which should penalize it for the benefit of Lawn-A-Mat.
Of course, this analysis disregards the position of Sandler as the moving force in both corporations. However, the record is insufficient to permit us to disregard the legal existence of the two corporate entities wherein the judgment complained of is held by one of them and not by Sandler individually.
Furthermore, to embark upon the path suggested by Lawn-A-Mat would require a full exploration of a complex set of facts involving not only Penn-Jersey's status as to assets, liabilities, cash posture, credit potential, etc., but also the makeup of Lawn-King, Inc. with regard to the holdings of other stockholders, the nature and extent of the capital investment, the effort and time spent by other personnel in initiating and developing the business, the acquisition of equipment beyond that which was owned by Penn-Jersey, and a myriad of other factors which may have come into play in the production of the income and profits of the newly formed corporation. Such a picture differentiates this situation from the simple case of an employee who mitigates by offering his personal services after the breach to another employer.
Since Lawn-A-Mat, which has the burden of proof, failed to establish such facts from which a court could find a continuity and identity between the two corporations, we *457 cannot assume such a conclusion merely from the fact that Sandler was the major force in both entities.
By the same token, just as the trial judge in the form of judgment did not pierce the corporate veil to consider Penn-Jersey as Sandler individually, so do we find it to be inappropriate to do so under the factual circumstances herein for the purpose of invoking the doctrine of mitigation in favor of the breaching party.
No authorities have been cited or found through independent research which support the thesis that mitigation should be allowed where two corporate entities are involved. In any event, without determining whether this factor alone should prevent mitigation, our view is that such mitigation is not available to this defendant under the evidence in this case.

IV
Penn-Jersey has cross-appealed from a portion of the judgment on the counterclaim in favor of Lawn-A-Mat for unpaid chemicals. It asserts that of the offset of $28,338.34, the sum of $4,505.60 was unwarranted because there was included in an arbitration award a sum of $4,386 for chemicals due to Lawn-A-Mat from David and Marc L. Sandler.
Our review of the record fails to reveal evidential support for the contention that the items involved in that arbitration award were identical with those involved in the counterclaim of defendant. We therefore find this assertion to be without merit.

Conclusion
In view of the foregoing, we direct that the judgment be modified so as to eliminate the punitive damage award of $30,000 and reduce the judgment in favor of Penn-Jersey on the main action to $45,000. Deducting therefrom the offset of the counterclaim of $28,338.34, the net judgment to be entered in favor of Penn-Jersey shall be $16,661.66.
No costs to either party.
NOTES
[1] Although some of these claims were against Sandler and members of his family as individuals, by consent of counsel to the form of order, they were incorporated in the total offset against the judgment in favor of Penn-Jersey.