**FIRST NATIONAL STATE BANK OF NEW JERSEY, Plaintiff,**

**v.**

**COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION OF NORRISTOWN, PENNSLYVANIA, Defendant.**

**George W. MATTEO, Sr., et al., Plaintiffs,**

**v.**

**COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION OF NORRISTOWN, PENNSYLVANIA.**

**Civ. A. Nos. 75–1712, 75–1690.**

United States District Court, D. New Jersey.

Aug. 21, 1978.

466

Greenbaum, Greenbaum, Rowe & Smith, by Paul A. Rowe, Newark, N. J., for plaintiff, First National State Bank of N. J.

Drinker, Biddle & Reath, by Patrick T. Ryan, Philadelphia, Pa., Capehart & Scatchard, P. A., Moorestown, N. J., by Joseph S. Georgiana, Camden, N. J., for defendant Commonwealth Federal Savings & Loan Association of Norristown, Pa.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

CLARKSON S. FISHER, District Judge.

This dispute involves the mortgage funding of a certain project with the construction of a shopping center in Camden County, New Jersey known as the Glen Oaks Shopping Mall (hereinafter "Glen Oaks" or "the shopping mall".)

Originally the action was instituted by the First National State Bank of New Jersey ("FNSB") in the Superior Court of New Jersey, Chancery Division (Essex County) and shortly thereafter another suit was filed in the Superior Court of New Jersey, Chancery Division (Camden County) by George W. Matteo, and others doing business as Mathema Developers ("Mathema"). Both actions were brought against Commonwealth Federal Savings and Loan Association of Norristown, Pennsylvania ("Commonwealth"). Thereafter, both suits were removed to this Court and consolidated for trial.

At the day of trial, Mathema did not appear and on motion by defendant, Commonwealth, *Matteo v. Commonwealth Federal Savings and Loan Assoc.*, Civ. 75–1690, was dismissed. The suit No. 75–1712 was tried to the bench.

In accordance with F.R.Civ.P. 52 the Court herein finds relevant and credible facts and conclusions of law.

Sometime before May, 1974 Mathema began construction of a shopping center at Chews Landing-Clementine Rd. and Kelly Drive Rd., Gloucester Twp., Camden County, New Jersey. This construction was being funded at that time by Central Mortgage Company ("Central"). Reaching the limit of its borrowing capacity with Central, Mathema, through Central, applied to Commonwealth for a stand-by commitment on the Glen Oaks project. After approval by the loan committee and the Board of Directors of Commonwealth, that institution issued a mortgage commitment agreeing to loan to Mathema the sum of $3,500,000 for a term of one year with interest at 16% or 6% above "prime rate of interest." The borrower was given an option to extend for an additional six months. The commitment required that "the entire project shall be constructed according to the plans and specifications submitted to this association . . ." Commonwealth's commitment does not contain a rental achievement clause and does not require 100% completion. (Exhibit J-2).

In consideration of its agreement to provide a permanent mortgage, pursuant to the terms of the commitment, Commonwealth received a fee from Mathema of $35,000 which was deposited into Commonwealth's general account.

At the time of Commonwealth's commitment for permanent lending, the shopping center was between 50 and 85% complete. On July 23, 1974 Commonwealth amended its commitment removing the condition which required an acceptable appraisal, having then received the appraisal of George Olassin, M. A. I. The amendment also revised the expiration date of the commitment to July 23, 1975.

Meanwhile, it was proposed that plaintiff FNSB fund the construction of the shopping mall. Prior to its acceptance of the construction mortgage, FNSB received an assignment of Commonwealth's mortgage commitment and in fact relied upon the commitment when it funded the construction.

What Commonwealth had issued was a stand-by or take-out commitment which, pursuant to the general practice of the banking industry, is issued for the express purpose of enabling a builder to obtain construction financing. These so-called stand-by commitments are designed to induce construction lenders to rely upon them since the stand-by commitment assures the construction lender that its loan will be paid at the end of its term from the funds provided by the stand-by lender. Not only did Commonwealth expressly consent to the assignment of a stand-by commitment, but as heretofore found, FNSB relied upon it.

On April 23, 1975 Martin L. Van Sant, Vice-President of FNSB, wrote to the borrower with a copy to Commonwealth requesting the closing of the permanent loan be had with Commonwealth on or before May 26, 1975. There was no answering letter and on June 13, 1975 FNSB directed a letter to Commonwealth "Attention Robert A. Messa, Vice-President" requesting immediate arrangements to close the loan before July 23, 1975.

Messa then caused an inspection of the subject property by David Terry, a contractor who reported to Commonwealth that the shopping mall was incomplete. Thereafter Terry made two more inspections, the second on June 20, 1975 and the third on July 21, 1975. There seems to be some serious question as to whether Terry even looked at the plans before, during or after his inspections but it is clear from the testimony that he certainly made no comparison between the physical layout of the mall and the plans and specifications.

On July 16, 1975 the builder wrote Commonwealth requesting the mortgage arrangement be closed before July 23, 1975. Commonwealth responded by letter on July 22, 1975 to the builder taking the position that the property had not been completed in accordance with the plans and specifications and therefore the commitment would expire on July 23, 1975. The matter was discussed prior to July 23, 1975 between Messa and Van Sant. Messa refused to indicate specifically what items were incom-

plete. It is clear from the evidence, however, that the only work that needed completion was so-called "tenants work". Van Sant indicated to Messa that he could escrow 1½ times the value of all such tenants work, even though FNSB or the builder were not responsible, but Messa rejected this offer. Van Sant indicated that the value of the tenants work was estimated by FNSB to be $22,000 and that FNSB was willing to escrow $40,000 to secure the performance of the work. This proposition was also rejected. Van Sant then requested that the Commonwealth inspector meet with the FNSB inspector to review the items which Commonwealth asserted were incomplete and this proposition was rejected.

FNSB then had hand delivered to Commonwealth a check in the amount of $17,500 together with a letter exercising the rights in the commitment of the borrower which had been assigned to FNSB to extend the commitment for six months. The check was delivered on July 22, 1975 the day before the expiration of the commitment. This was responded to on July 24, 1975, the day after the expiration of the commitment when the check was returned because it had been delivered under protest. Thereafter FNSB re-delivered a check to Commonwealth on July 25, 1975 removing the protest. That check was also rejected.

When the builder was unable to pay the construction loan FNSB was forced to foreclose its mortgage and obtain a judgment in foreclosure.

I find that the shopping mall was complete prior to the builder's request to close the permanent loan with Commonwealth with the possible exception of a few minor items.

Since the foreclosure the shopping mall has been operated by FNSB at a substantial loss. The mall was approximately 25% occupied in the summer of 1975 and is presently 50% occupied.

This Court clearly infers from the factual background of this case that Commonwealth, knowing the losing proposition would then be thrust into its hands, improperly tried to avoid its commitment which is clear and unambiguous.

Since this is a diversity action founded upon 28 U.S.C. § 1332, this Court is required to apply the law which the New Jersey state courts would apply. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). It appears that the conflicts of law rule which would be applied by a New Jersey court is "*lex loci contractus*," i. e., the law of the place of the making of the contract. *Cockrell v. McKenna*, 104 N.J.L. 592, 593, 142 A. 20 (E & A 1928); *Ray v. Beneficial Fin. Co.*, 92 N.J.Super. 519, 530, 224 A.2d 143 (Ch.Div. 1966); *but cf., Evo v. Jomac, Inc.*, 119 N.J. Super. 7, 13, 289 A.2d 551 (Law Div.1972). Even if this Court was to disregard this hard-and-fast rule, as has been the emerging trend in New Jersey, *see Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 305 A.2d 412 (1973); *Pfau v. Trent Aluminum Co.*, 55 N.J. 511, 263 A.2d 129 (1970); *Mellk v. Sarahson*, 49 N.J. 226, 229 A.2d 625 (1967), the substantive law of New Jersey would still be applicable. Pennsylvania, the only other state having any cognizable interest in this matter, is only implicated by the happenstance of the defendant Commonwealth being a resident of that State. Insofar as the contract was entered into in New Jersey, expressly governed by New Jersey law, and was to be performed and affect real estate in New Jersey, there is no need to give preference to either conflicts of law rule, *see Evo, supra*, 119 N.J.Super. at 13, 289 A.2d 551.

As mentioned previously, Commonwealth's attempt to avoid performance of its part of the commitment was premised upon the following portion of the agreement:

"The entire project shall be constituted according to the plans and specifications submitted to this association . . . ."

However, it is clear that a mortgage lender is bound to perform once the building contractor has "substantially completed" con-

struction. When the contractor has fairly met this requirement, the mortgage lender may no longer avoid its commitment, although he may be entitled to a set-off for minor defects or omissions. All that is required of the building contractor is a good faith compliance with all the important particulars of the plans and specifications. One hundred per cent completion, unless called for, is not necessary. *Jardine Estates v. Donna Brook Corp.*, 42 N.J.Super. 332, 337, 126 A.2d 372 (App.Div.1956); *Palmeri v. Albanese*, 12 N.J.Super. 338, 342, 79 A.2d 699 (App.Div.1961); *Selective Builders v. Hudson City Savings Bank*, 137 N.J.Super. 500, 504, 349 A.2d 564 (Ch.Div.1975).

Here, Commonwealth's contention that the shopping mall was not completed was based on the opinion of its on-the-site inspector David Terry. As noted previously, it appears that Terry viewed the shopping mall unfettered by the construction plans. He testified that he looked at the plans prior to inspecting the premises, and made observations of the construction site upon his recollection of the plans. The sole basis of his conclusion that the mall was incomplete was the absence of carpeting, floor, walls, wall coverings or paint in *unrented* stores. However, it was the testimony of plaintiff's expert witness, Lowell Brody, that these items were "tenant's work", i. e., work to be performed by the tenants, after leases were signed, and not to be performed by the landlord-owner. Indeed, this being so, the incomplete items upon which Commonwealth based its contention that the property had not been completed pursuant to the plans and specifications, were not to be performed by the contractor at all. So that even though these items were merely minor in nature, the uncontradicted testimony of Mr. Brody indicates that the plans and specifications did not require the landlord-owner to perform this work. It is upon this that I find the project to have been substantially completed. There was testimony that minor changes were made in the construction from the original plans and specifications. However, the facts further disclose that these slight variations enhanced the value of the property and were certainly not substantial in nature.

I now turn to the more troublesome aspect of this case. That is, what remedy, or combination of remedies, will restore the injured party to his former status.

Specific performance, which plaintiff seeks, is an extraordinary remedy but a remedy which is appropriate when an alternative remedy at law is inadequate. *Fleischer v. James Drug Stores*, 1 N.J. 138, 146, 62 A.2d 383 (1948); *Mantell v. International Plastic Harmonica Corporation*, 141 N.J.Eq. 379, 390, 55 A.2d 250 (E & A 1947); *Centex Homes Corp. v. Boag*, 128 N.J.Super. 385, 389, 320 A.2d 194 (Ch.Div.1974). The ruling principle is that specific performance will be ordered if it will "do more perfect and complete justice". *Wilson v. Northampton and Bamburg Junction Railway Co.*, L.R. 9 Ch.A.C. 279, 283 (1874); *Fleischer, supra.*

It has long been acknowledged that specific performance is an appropriate remedy in two general instances: (a) where damages are impracticable, i. e., when "it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty," and (b) where damages are inadequate, i. e., "where the subject-matter of the contract is of such a 'special nature' or of such a 'peculiar value' that damages ascertained by legal rules 'would not be a just and reasonable substitute for or representative of that subject-matter in the hands of the party who is entitled to its benefit.'" *Fleischer, supra*, 1 N.J. at 146–147, 62 A.2d at 387; *Curtice Brothers' Co. v. Catts*, 72 N.J.Eq., 831, 832, 66 A. 935 (Ch.1907); *Pomeroy's Equity Jurisprudence* (5th Ed. 1941), §§ 1402, 1403.

There are a variety of situations which may arise under this latter topic. For example, the typical case is where the contract is for the conveyance of land. The traditional approach has been to assume that the remedy at law for such a contract is inadequate and incomplete. *See Dobbin v. Plager*, 92 N.J.Eq. 231, 111 A. 404, 926 (Ch.1920), *affirmed id.* (E & A 1920); *Maz-*

zola v. Malley, 5 N.J.Super. 562, 68 A.2d 655 (Ch.Div.1949); *Hazelton v. Miller*, 25 App. D.C. 337, 341–342 (D.C.Cir.1905), *affirmed on other grounds sub nom. Hazelton v. Scheckels*, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939, 6 Ann.Cas. 217 (1906); *Simpson, "Fifty Years of American Equity"*, 50 Harv.L. Rev. 169, 174 (1936); Pomeroy's *Equity Jurisprudence, supra*, § 1402 at p. 1034.

In addition, since *Pusey v. Pusey*, 1 Vern. 273 (1684), a case involving possession of a horn anciently given to the Pusey family by the Danish King Canute, specific relief has been available where there is a contract for the sale of a unique chattel. *See also, Duke of Somerset to Cookson*, 3 P.Wms. 389 (1735) (a silver patera dedicated to Hercules); *Burr v. Bloomsberg*, 101 N.J.Eq. 615, 138 A. 876 (Ch.1927) (a ring of sentimental value); N.J.S.A. 12A:2–716(1).

Quite simply, the question turns on whether the subject matter is unavailable in similar form. For example, in *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 63 N.J.Super. 384, 394, 164 A.2d 785 (App.Div.1960), the court recognized the uniqueness of a lease of space in a particular shopping center. On the other hand, it was held in *Centex, supra*, 128 N.J.Super. at 393, 320 A.2d 194, that specific performance was inappropriate where the contract was for the sale of a condominium apartment unit. The *Centex* court stated that "regardless of [its] realty label," a condominium apartment unit "has no unique quality but is one of hundreds of virtually identical units being offered by a developer for sale to the public." 128 N.J.Super. at 393, 320 A.2d at 198.

In regard to the case at hand, one New Jersey court has deemed a contract for the financing of a shopping center unique. *Selective Builders v. Hudson City Savings Bank, supra*, 137 N.J.Super. at 507–508, 349 A.2d 564; *see also, St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 278 A.2d 12 (Ct.App.1971). Of course, this is not a per se rule. If a plaintiff could find another mortgage lender willing to enter into a similar contract, then the need for specific relief would vanish. Indeed the court in *Selective Builders* noted that "Selective has been trying to arrange for other suitable mortgage financing since January 3, 1975 [two days after the proposed closing] without success." 137 N.J.Super. at 507–508, 349 A.2d at 569.

While there has been no evidence of the efforts of either Mathema or FNSB to fund this project through another mortgage lender after Commonwealth breached the agreement, it is reasonable to infer from the nature of the agreement, and the notable lack of success of this shopping mall, that there is no hope of obtaining similar financing.[1]

Specific performance is also appropriate as previously mentioned where there is difficulty in reaching a proper measure of damages. Such is the case here. While the testimony of the real estate experts was certainly comprehensive, the damage done to this partially-rented shopping mall simply does not lend itself to accurate evaluation. I find, as did the Court in *Selective Builders*, that a legal measure of damages would be difficult to calculate, and, moreover, that an award of damages would fail to make plaintiff whole.

Lastly, FNSB seeks an award of exemplary, or punitive, damages. Commonwealth asserts that due to the nature of this cause of action, i. e., breach of contract, punitive damages should not be assessed, citing *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 358 A.2d 805 (App.Div.1976), *cert. denied* 71 N.J. 503, 366 A.2d 658 (1976).

Traditionally, punitive damages are assessed so as to punish the wrongdoer and deter any further similar conduct. *Berg. v. Reaction Motors Div.*, 37 N.J. 396, 412–413, 181 A.2d 487 (1962); *Fisher v. Volz*, 496 F.2d 333, 347 (3d Cir. 1974); Prosser, *Torts*, § 2 at page 9 (4th Ed. 1971). An award of

---

**1.** The fact that FNSB is an assignee of the contract does not, as has been contended, limit its right to specific performance. *Cwiakala v.* *Giunta*, 23 N.J.Super. 261, 92 A.2d 849 (Ch.Div. 1952).

punitive damages is appropriate when "the wrongdoer's conduct is especially egregious." *Leimgruber v. Claridge Associates, Ltd.*, 73 N.J. 450, 454, 375 A.2d 652, 654 (1977).

However, Judge Larner held in *Sandler* that:

"[i]n the absence of exceptional circumstances dictated by the nature of the relationship between the parties or the duty imposed upon the wrongdoer, the concept of punitive damages has not been permitted in litigation involving breach of a commercial contract.

Where the essence of a cause of action is limited to a breach of such a contract, punitive damages are not appropriate regardless of the nature of the conduct constituting the breach." 141 N.J.Super. at 449, 358 A.2d at 811 (citations omitted)

A number of exceptions to this rule appear to exist. But these exceptions arise out of instances where there is more than just a breach of contract. That is, there must be a breach of trust. *See,* for example, the cases cited by Judge Larner in *Sandler, supra,* 141 N.J.Super. at 449–450, 358 A.2d 805. *See also Kocse v. Liberty Mutual Insurance Co.*, 152 N.J.Super. 371, 376–77, 377 A.2d 1234 (Law Div.1977).

In determining the propriety of an award of punitive damages, I note at the outset that the case at hand fits no known exception of the *Sandler* rule. Insofar as *Sandler* is not a decision of the highest Court of the State, however, this Court is not bound by its holding. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1966); *Paoletto v. Beech Aircraft Corp.*, 464 F.2d 976 (3d Cir. 1972).

Rather, "an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. A. T. & T. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 86 L.Ed. 139 (1940). The Court of Appeals for the Third Circuit has construed this to mean,

"That while we may not ignore the decision of an intermediate appellate court, we are free to reach a contrary result if, by analyzing 'other persuasive data', we predict that the New Jersey Supreme Court would hold otherwise. In short, an intermediate appellate court holding is presumptive evidence, rather than an absolute pronouncement, of state law." *National Surety Corp. v. Midland Bank*, 551 F.2d 21, 30 (1977).

In applying this *Erie*-imposed doctrine, I note the presence of no "other persuasive data" in the form[2] of a decision of any New Jersey court which would give rise to disregarding the *Sandler* case. Finding it to be well-reasoned and unopposed by the courts of New Jersey on an equal or superior level, I must apply the *Sandler* holding to the case at hand and deny FNSB's request for punitive damages.

---

2. Of course, the denial of the petition for certification by the New Jersey Supreme Court in *Sandler* imparts no expression of opinion on the merits of the case. *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, 507 (1953); *West Point Island Civic Ass'n v. Twp. Com. of Dover Twp.*, 54 N.J. 339, 344, 255 A.2d 237 (1969); *Kutcher v. Housing Authority of Newark*, 20 N.J. 181, 185, 119 A.2d 1 (1955).