610 F.2d 164
 FIRST NATIONAL STATE BANK OF NEW JERSEY, a National Banking
Association organized under the Acts of Congress
v.
COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION OF
NORRISTOWN, Appellant.
 No. 79-1091.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 10, 1979.
Decided Dec. 3, 1979.
Rehearing In Banc Denied Dec. 26, 1979.
As Amended Jan. 3, 1980.
 
 Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., Joseph S. Georgiana, Capehart & Scatchard, P. C., Moorestown, N. J., for appellant.
 Paul A. Rowe, Greenbaum, Greenbaum, Rowe & Smith, Newark, N. J., for appellee; Dennis A. Estis, Douglas K. Wolfson, on brief.
 Before ADAMS, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 In this diversity action, we are asked to reverse a decree of specific performance and an assessment of additional damages. Suit was brought by First National State Bank of New Jersey (First National), as assignee of a real estate developer, for breach by Commonwealth Federal Savings & Loan Association of Norristown (Commonwealth) of a standby commitment for permanent mortgage financing of a shopping center. We hold that the district court did not err, and affirm its judgment for the reasons set out below.
 
 I.
 
 2
 Mathema Developers began construction of the Glen Oaks Shopping Mall in Camden County, New Jersey, in the latter part of 1973, with the proceeds of a loan from South Jersey National Bank. In early May 1974, Central Mortgage Company applied on behalf of Mathema for a one year standby commitment "just to give (the developer) enough time to complete and secure his permanent financing when the market may look a little brighter."
 
 
 3
 As with most real estate developments, the financing here was to take place in two stages: a short-term construction loan and a long-term permanent loan. The construction loan was to finance the actual construction of the project and the permanent loan, or mortgage loan, was designed to replace or "take out" any short-term borrowings. A permanent loan is generally obtained from a savings institution or insurance company, while a construction lender usually is a commercial bank.[1] A standby commitment obligates the permanent lender to refinance the construction loan if called upon to do so by the developer, but in addition generally provides the borrower with the option to search for an alternative lender with more advantageous terms. The premium paid for this option is a nonrefundable fee, and the commitment enables a developer to seek short term construction financing.
 
 
 4
 On May 21, 1974, Commonwealth executed a standby commitment for a loan of $3,500,000 at an interest rate of sixteen percent or six percent above the prime rate, whichever was higher. In return for this commitment, Mathema was to pay, and did pay, one percent of the loan amount. Under its terms, the commitment could be extended by the borrower for another half-year by paying an additional one-half percent. The major condition of the commitment was that "(T)he entire project . . . be constructed according to the plans and specifications submitted to Commonwealth and as appraised by Mr. George Olassin, M.A.I."[2] The condition requiring an acceptable appraisal by Mr. Olassin was subsequently eliminated after the appraisal was received. As thus amended, the commitment was to expire on July 23, 1975. The district judge, sitting without a jury, found that at the time the commitment was issued, the shopping mall was between fifty and eighty-five percent completed. Neither a specific rental achievement clause nor a requirement of one hundred percent completion was included in the commitment.[3]
 
 
 5
 Concurrent with its negotiations for the standby agreement, Mathema applied to First National for a construction loan. In deciding whether to make the construction loan, First National's vice-president, Mr. Van Sant, personally examined the mall; requested certain credit information and a copy of the standby commitment; and inquired of Commonwealth as to the developer's credit rating, Commonwealth's ability to fund its commitment, and whether it would consent to an assignment of the commitment to First National. Mr. Van Sant also directed First National's own appraiser to make a detailed inspection of the mall.
 
 
 6
 After investigating these matters to his satisfaction, Mr. Van Sant, on behalf of First National, issued a letter to Mathema, dated July 30, 1974, setting forth approval of the application for a construction loan of $3,600,000, as well as the bank's conditions before the loan could be consummated. Among the conditions was the requirement that the standby mortgage lender consent to an assignment of the commitment by Mathema to First National. Written consent was soon obtained from Commonwealth. Thus the trial judge found that "(p)rior to its acceptance of the construction mortgage, (First National) received an assignment of Commonwealth's mortgage commitment and in fact relied upon the commitment when it funded the construction." 455 F.Supp. 464, 467 (D.N.J.1978).
 
 
 7
 At the time First National approved Mathema's request for the construction loan, it disbursed $2,850,000, the bulk of which went to pay off the existing construction loan with South Jersey National Bank. First National's appraiser had estimated then that the shopping mall was "(a)pproximately 95% Complete except tenant work which is under way or to be started," that $163,000 would be necessary to complete the work to be done, and that the entire mall should be completed by October 1974.[4]
 
 
 8
 Nevertheless, an additional amount of approximately $500,000, exclusive of interest, was ultimately disbursed by First National to Mathema. First National's assertion that all these funds were advanced for construction already in place was disputed by Commonwealth.[5]
 
 
 9
 On April 23, 1975, Mr. Van Sant wrote to Mathema, with a copy to Commonwealth, requesting that a closing be arranged on the permanent loan. By that time, the shopping mall was already in grave economic difficulties, inasmuch as only twenty-five percent of the available space in it had then been rented. When no answer to the request for a closing was received, First National wrote to Commonwealth, on June 13, 1975, to request immediate arrangements to close the loan before July 23, the expiration date of the standby commitment. Commonwealth sent a contractor to inspect the shopping mall, and he reported that construction was incomplete. On this point, the trial judge found: "There seems to be some serious question as to whether (the contractor) even looked at the plans before, during or after his inspections but it is clear from the testimony that he certainly made no comparison between the physical layout of the mall and the plans and specifications." 455 F.Supp. at 467.
 
 
 10
 In a letter dated July 16, 1975, Mathema also requested closing of the permanent loan. Commonwealth responded, in a letter dated the day before its commitment was to expire, that it would not close the loan because the "property has not been completed according to the plans and specifications." Neither in this letter, nor in discussions with First National prior to it, did anyone from Commonwealth elaborate as to what items were incomplete. The district court found it "clear from the evidence . . . that the only work that needed completion was so-called 'tenants work.' " 455 F.Supp. at 468.
 
 
 11
 Although maintaining that neither Mathema nor First National was responsible for the work left undone, Mr. Van Sant offered to place in escrow a sum of money to secure performance equivalent to 11/2 times the value of the work that Commonwealth claimed was incomplete. This proposition was rejected by Commonwealth; also rejected was a suggestion that inspectors of the two banks meet to review the assertedly incomplete work.
 
 
 12
 The day before the expiration of Commonwealth's commitment, First National exercised the right, that had been assigned it by Mathema, to extend the commitment for half a year by delivering to Commonwealth a check for $17,500. The day after the expiration, Commonwealth returned the check on the stated ground that it had been delivered under protest. A subsequent check delivered by First National without protest was also rejected.
 
 
 13
 When the builder was unable to keep up its loan payments, First National proceeded with foreclosure, and it has operated the shopping mall ever since at a substantial loss.[6] Both Mathema and First National brought suit in the New Jersey state court for specific performance of the loan. Both actions were removed to federal district court and consolidated for trial, but Mathema's claim was dismissed at trial for failure to prosecute.
 
 
 14
 Following trial, judgment in favor of First National was entered. Specifically, Commonwealth was ordered to perform its obligation under the commitment, to pay interest at eight percent on the amount of the loan from the time the loan should have been made until such time as the money is turned over to First National, and to reimburse with interest the amount First National has lost in operating the mall.
 
 II.
 
 15
 Commonwealth sets forth the following points in appealing the district court's order: First, it did not breach its standby commitment because Mathema did not complete the mall in accordance with the submitted plans and specifications. Second, First National breached its obligations to Commonwealth as a third-party beneficiary of the loan agreement between Mathema and First National. Third, specific performance is not appropriate, because it is an extraordinary remedy that should not be granted either in mortgage loan agreements in general or under the particular facts and equities of this case. Fourth, the award of damages is an alternative remedy and should not be ordered as a supplement to specific performance. In considering Commonwealth's contentions in this diversity action, we follow the law of New Jersey since that is the state in which the contract was made as well as the state with the greatest interest in this dispute over property within its jurisdiction.[7]
 
 
 16
 In seeking to avoid its contractual commitment, Commonwealth invokes the portion of the agreement which states that "(t)he entire project shall be constituted according to the plans and specifications submitted to this association," and asserts that the doctrine of substantial performance does not apply. At trial, First National's architectural expert testified to certain variances between the construction plans and the mall as built, and estimated that the variances saved the builder about $50,000. Some changes, however, were estimated to have enhanced the value of the project by twice that amount. In addition, Commonwealth discovered shortly before trial more than two and a half years after it refused to perform its loan agreement that the electrical distribution system installed in the mall did not conform to the plans. This change was assessed by Commonwealth's expert to have added substantially to the operating costs of the mall. First National's expert testified, however, that the electrical system called for in the original specifications could not accommodate the needs of the mall at full operation.
 
 
 17
 It is for the trier of fact to evaluate the credibility of conflicting testimony as to the necessity of any variance between the plans and the construction in place, as well as the overall enhancement or detriment to the project resulting from such changes.[8] Any lack of congruence between the original plans and specifications and the actual construction was slight, the district court found, and in fact it "enhanced the value of the property." The trial judge also found that the project was substantially completed when Commonwealth refused to "close" the loan. 455 F.Supp. at 469. We perceive no basis for overturning these findings.
 
 
 18
 New Jersey law is clear that "where there is substantial performance of a building contract, even though attended by minor shortcomings, the contract price may be recovered, less a fair allowance . . . to make good the defects." Winfield Mutual Housing Corp. v. Middlesex Concrete Products and Excavating Corp., 39 N.J.Super. 92, 97, 120 A.2d 655, 657 (App.Div.1956).[9] The contract we interpret here was drafted by Commonwealth, and any ambiguities are therefore to be construed against it.[10] If complete and perfect performance by the builder were essential before Commonwealth was required to honor its commitment, it was for the drafter explicitly so to state.[11]
 
 III.
 
 19
 Commonwealth contends that it "was a third-party beneficiary of First National's commitment and building loan agreement with Mathema," and that as a third-party beneficiary, "Commonwealth could use those contracts as a matter of defense in this action." The New Jersey statute specifically allows "(a) person for whose benefit a contract is made" to employ that contract as a defense in an action against him. N.J.Stat.Ann. § 2A:15-2 (West). Even if we were to hold that Commonwealth was a third-party beneficiary of the contract between First National and Mathema, however, it is doubtful that it would be entitled to raise the issue on appeal, inasmuch as it did not set forth this affirmative defense in its pleadings as required by Fed.R.Civ.P. 8(c).
 
 
 20
 We conclude, in any event, that under New Jersey law Commonwealth is not a third party beneficiary. "The essence of contract liability to a third party is that the contract be made for the benefit of said third party within the intent and contemplation of the contracting parties. Unless such a conclusion can be derived from the contract or surrounding facts, a third party has no right of action under that contract despite the fact that he may derive an incidental benefit from its performance." Gold Mills, Inc. v. Orbit Processing Corp., 121 N.J.Super. 370, 373, 297 A.2d 203, 204 (Law Div.1972).[12]
 
 
 21
 Neither of the cases cited by Commonwealth for the proposition that it is a thirdparty beneficiary of First National's loan agreement is helpful. In Graybar Electric Co., Inc. v. Continental Casualty Co., 50 N.J.Super. 289, 142 A.2d 114 (App.Div.1958), a surety for a construction company was held responsible for the debt of a subcontractor to a sub-subcontractor. The court looked only to the explicit language of the surety contract in deciding that the sub-subcontractor was a third-party beneficiary of the surety contract. The agreement stated that it was made for the benefit of "any subcontractors, materialman, laborer, person, firm or corporation having a just claim." Id. at 296, 142 A.2d at 118. Sweeney v. Veneziano, 70 N.J.Super. 185, 175 A.2d 241 (App.Div.1961), involved an assignment to one partner of the partnership's claim, with the proviso that the assignee pay all counsel fees arising from that claim. Plaintiff's decedent, Sweeney, was the lawyer who drew up the contract and who later sued for the counsel fees due on the claim. The court held that the contract by its language was partially for the benefit of a third party, and it was clear from the circumstances that Sweeney was that third party even though he was not mentioned by name in the agreement. Id. at 195, 175 A.2d at 246-47.
 
 
 22
 In this case First National may have paid out more money to Mathema than it was obligated to do under its construction loan agreement, but we find nothing in the loan agreement to indicate the requisite intent that Commonwealth be a beneficiary of any contractual limitation as to the use of the loan money. Indeed, the contract between First National and Mathema seems specifically to exclude an intent to create any third-party beneficiary.[13] The financial institution that eventually funded the permanent loan would benefit by First National's frugality, but this does not by itself suffice to make the eventual permanent lender an intended beneficiary.
 
 IV.
 
 23
 We come now to what appears to be the most provocative issue on this appeal, namely whether the decree of specific performance was proper. Under New Jersey law, the "right to the equitable remedy of specific performance turns upon the existence of an adequate remedy at law; and the adequacy of the legal remedy of compensation depends upon the facts and circumstances of the particular case . . . . There is no definitive formula automatically resolving every case." Fleischer v. James Drug Stores, Inc.,1 N.J. 138, 146, 62 A.2d 383, 387 (1948). Generally, the remedy at law is said to be inadequate in two situations: (1) where damages would be insufficient because the subject matter of the contract is of such a special nature that it resists translation into quantitative terms the damage remedy " 'would not be a just and reasonable substitute for or representative of that subject-matter in the hands of the party who is entitled to its benefit' "; or (2) where "damages are impracticable" because "it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty." Id. at 146-47, 62 A.2d at 387.
 
 
 24
 Traditionally, courts have been reluctant to grant specific performance of agreements to lend or borrow money,[14] inasmuch as money is intrinsically fungible.[15] The more recent cases, however, and especially those involving construction loans, have shown a greater recognition that specific performance may be justified in exceptional circumstances.[16] Scholarly commentary is in general agreement with this trend, at least insofar as the borrower's remedy is concerned.[17]
 
 
 25
 The district judge in this case determined that both of the Fleischer rationales for specific performance were applicable to the facts before him. He found that New Jersey law supported the principle that a contract for the financing of a shopping center is unique, in the sense that the term has been used in cases granting specific performance, because the subject matter itself is "unavailable in similar form." Further, he ascertained that the damages suffered by First National were not susceptible to accurate calculation and that "an award of damages would fail to make plaintiff whole." 455 F.Supp. at 470.
 
 
 26
 In so holding, the trial judge placed principal reliance on Selective Builders, Inc. v. Hudson City Savings Bank, 137 N.J.Super. 500, 349 A.2d 564 (Ch.Div.1975), a case from a New Jersey trial court with facts strikingly similar to those sub judice.[18] That decision appears to be an accurate statement of New Jersey law and represents the best authority available in predicting how the highest court of New Jersey would rule on the issue.[19]
 
 
 27
 Commonwealth attempts to distinguish Selective Builders on two grounds, neither of which is persuasive. First, it declares that Selective Builders turned on issues of waiver and estoppel that do not apply here. Our reading of the case, however, reveals that issues of waiver and estoppel surfaced only in the chancery court's discussion of whether one hundred percent completion was required by the agreement, and that these factors were introduced as alternative rationales to the court's primary conclusion that substantial performance was sufficient. See id. at 505-06, 349 A.2d at 566-68. Second, Selective Builders is said to be distinguishable because the developer there had tried without success to secure other mortgage financing, while there is no evidence here that First National made any such effort. But the court in Selective Builders quoted approvingly from a decision of Maryland's highest court that emphasized the futility of seeking alternative mortgage financing for an obviously failed project:
 
 
 28
 "(T)he would be permanent mortgage lender must contemplate that if, at the last minute, it cancels its commitment such action would be disastrous to the borrower; that in such event obtaining a new permanent mortgage loan would be well-nigh impossible, for the reason that whatever brought about the cancellation would in all likelihood prevent another lender from entering the fray . . . ."
 
 
 29
 137 N.J.Super. at 507-08, 349 A.2d at 509 (ellipsis in original) (quoting St. Paul at Chase Corp. v. Manufacturers Life Ins. Co., 262 Md. 192, 278 A.2d 12, 36 (1971)).
 
 
 30
 After noting that neither Mathema nor First National had sought to find another lender to fund the project in this case, the trial judge stated that "it is reasonable to infer from the nature of the agreement, and the notable lack of success of this shopping mall, that there is no hope of obtaining similar financing." 455 F.Supp. at 470. Since both parties agree that the shopping mall is a financial failure, it would appear paradoxical for Commonwealth to insist that First National should have attempted to persuade some other mortgage lender to take over a bad investment. We therefore reject Commonwealth's assertion that specific performance was improper because First National should have attempted to mitigate its damages by obtaining substitute performance at a higher interest rate.[20]
 
 
 31
 There is ample evidence in the record to support the district court's conclusion that accurate calculation of damages was impracticable in this case. The basic measure of such damages would be to subtract from the amount of the permanent loan the estimated value of the shopping mall. However, the distinct qualities of such a property preclude a definitive estimate. The trial judge would have been forced to choose among widely disparate appraisals of the value of the mall. For tax purposes the property was appraised at $1,070,000. First National's expert witness testified that at the time of trial the fair market value of the mall was $1,500,000, while Commonwealth's expert gave three valuations, all based on at least a ninety percent occupancy rate. They ranged from $2,500,000 ("pessimistic") through $2,800,000 ("most probable") to $3,500,000 ("optimistic").
 
 
 32
 If it were necessary, of course, the trial judge could choose a figure among these estimates predicated on his assessment of the witnesses' relative credibility. It is apparent from the difficulty of choosing among the estimates, though, that a decree of specific performance was appropriate because it would " 'do more perfect and complete justice.' "[21] Commonwealth, the party breaching the agreement, would then have the burden of owning the shopping mall and would realize the true market value either by operating the mall or selling it.[22]
 
 
 33
 As between the construction lender and the permanent lender, it does not appear unreasonable to place the risk of the success or failure of a real estate venture on the latter. Real estate developments generally are riskier than other business investments, and therefore mortgage rates are significantly higher than interest rates on most other loans. If the permanent lender can escape its commitment when a project seems to have failed, that party will have achieved a significant shifting of risks without a corresponding shift in the returns on successful ventures.[23] A permanent lender's primary security on such a venture is the capitalized value of the project,[24] and so it is the permanent lender, not the construction lender, that has the responsibility and presumably the expertise to analyze the business risks.[25] It is therefore appropriate to place the risk of the project's nonviability on the permanent lender. As one scholar has stated, "If the project is nonviable, the risk being allocated as between the construction lender (and associated third parties) and the permanent lender is the risk of failing to achieve satisfaction through foreclosure and a deficiency judgment. Since the earlier lenders were relying upon the property, the developer, and the permanent financing, while the permanent lender had only the property and the developer upon which to rely, it seems fair that this risk should fall on the permanent lender."[26]
 
 
 34
 We recognize that the result in this case will work substantial hardship on Commonwealth, but any alternative would work an equal hardship on First National inasmuch as neither wants to be in the business of operating a shopping center. Because Commonwealth agreed to be the permanent lender, and because it is the party that breached the commitment, we cannot say that the trial judge abused his discretion in requiring Commonwealth to shoulder the burden.
 
 V.
 
 35
 Commonwealth's final point on appeal is that the district court erred in granting incidental damages in addition to specific performance. The object of a remedy for breach of contract is to make the aggrieved party whole. When a court decrees specific performance, it should also adjust the equities to place the parties as far as possible in the same position that they would have occupied had the agreement been completed on the prescribed day.[27] If Commonwealth had "taken out" the construction loan on the prescribed date, First National would have had the benefit of interest derived from the money paid to it by Commonwealth at that time. It is equally clear that had the loan come through on time, Commonwealth, rather than First National, would have had to foreclose on Mathema's debt and would have become the owner of the shopping mall. Consequently, we cannot say that it was improper for the trial court to award damages incidental to the breach covering reimbursement for interest and for losses sustained in operating the mall.
 
 
 36
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 Mehr & Kilgore, Enforcement of the Real Estate Loan Commitment: Improvement of the Borrower's Remedies, 24 Wayne L.Rev. 1011, 1012-13 & n. 9 (1978). The power of national banks to invest in real estate is limited by the Federal Reserve Act, but a construction loan is not considered a real estate loan if a "valid and binding agreement" to pay off the construction loan upon the project's completion has been made by a permanent lender. 12 U.S.C. § 371 (1976); See Mehr & Kilgore, Supra, 1012 n. 9
 
 
 [2]
 The initials, M.A.I., stand for Member of the American Institute of Real Estate Appraisers
 
 
 [3]
 A specific rental achievement clause would state a percentage of rental space that must be occupied before the loan would be completed. A 100% Completion requirement would make clear that construction must be completed, with no leeway for substantial performance
 
 
 [4]
 Mr. Van Sant testified that construction of the mall was in fact completed by November 1974
 
 
 [5]
 In its brief, Commonwealth refers to "a questionable total of some $1,000,000 which should not be factored into the base price of the loan." Appellant's Brief at 29. It is unclear just how much is alleged to have been improperly disbursed and why. First National states, "All advances which were made by (First National) to Mathema were made on the certification of the engineer to (the bank) that the work had been completed." Appellee's Brief at 8
 
 
 [6]
 At the time of trial, the mall was fifty percent occupied. 455 F.Supp. at 468
 
 
 [7]
 The trial judge declared: "Insofar as the contract was entered into in New Jersey, expressly governed by New Jersey law, and was to be performed and affect real estate in New Jersey, there is no need to give preference to either conflicts of law rule. . . ." 455 F.Supp. at 468
 
 
 [8]
 See Jardine Estates, Inc. v. Donna Brook Corp., 42 N.J.Super. 332, 338, 126 A.2d 372, 375 (App.Div.1956) ("Where there is conflicting testimony as to whether or not the contractor has substantially performed the contract, the issue is to be determined by the trier of the facts.")
 
 
 [9]
 Accord Jardine Estates, Inc. v. Donna Brook Corp., 42 N.J.Super. 332, 337, 126 A.2d 372, 375 (App.Div.1956); See Van Dusen Aircraft Supplies, Inc. v. Terminal Constr. Corp., 3 N.J. 321, 329, 70 A.2d 65, 69 (1949). Commonwealth cites only one case for its contention that the doctrine of substantial performance is inapplicable when a project is not constructed according to the plans and specifications. Appellant's Brief at 17 (citing Franklin E. Penney Co. v. United States, 524 F.2d 668, 207 Ct.Cl. 842 (1975)). We note that, were that case to stand for the proposition asserted, it would not control our interpretation of New Jersey law, inasmuch as the Penney case arose in the Court of Claims. The most that can be said, however, is that the Penney case has some language arguably supportive of Commonwealth's position. The Court of Claims stated that the doctrine of substantial performance "should not be carried to the point where the non-defaulting party is compelled to accept a measure of performance fundamentally less than had been bargained for. Substantial performance 'is never properly invoked unless the promisee has obtained to all intents and purposes all benefits which he reasonably anticipated receiving under the contract.' " Franklin E. Penney Co. v. United States, 524 F.2d 668, 677, 207 Ct.Ct. 842 (1975) (quoting In re Kinney Aluminum Co., 78 F.Supp. 565, 568 (S.D.Cal.1948)). The Court of Claims observed, however, that "(b)uilding and construction contracts offer the most frequent examples of (the doctrine's) application." Id. at 676
 
 
 [10]
 Fidelity Land Dev. Corp. v. Rieder & Sons Bldg. & Dev. Co., Inc., 151 N.J.Super. 502, 514, 377 A.2d 691, 697 (App.Div.1977)
 
 
 [11]
 In Selective Builders, Inc. v. Hudson City Sav. Bank, 137 N.J.Super. 500, 349 A.2d 564 (Ch.Div.1975), the New Jersey court, construing a construction contract, held that 100% Completion is not required unless such a condition is explicit in, or may be implied from, the language of the agreement: "Substantial completion is compliance with this type of contract in the absence of any expressed agreement to the contrary." Id. at 509, 349 A.2d at 567
 
 
 [12]
 See Borough of Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73, 77, 11 A.2d 83, 85 (1940) ("(T)he real test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts; and the fact that such a benefit exists, or that the third party is named, is merely evidence of this intention.")
 
 
 [13]
 Part VI, paragraph 9 of the contract states:
 All conditions of the obligation of the Bank to make advances hereunder are imposed solely and exclusively for the benefit of the Bank and its assigns and no other person or persons shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that the Bank will refuse to make advances in the absence of strict compliance with any or all thereof and no other person or persons shall, under any circumstances, be deemed to be a beneficiary or beneficiaries of such conditions, any and all of which may be waived in whole or in part by the Bank if in its sole discretion it deems advisable to do so.
 
 
 [14]
 Draper, The Broken Commitment: a Modern View of the Mortgage Lender's Remedy, 59 Cornell L.Rev. 418, 420-21 (1974); Mehr & Kilgore, Supra, note 1, at 1025; Annot., Specific Performance of Agreement to Lend or Borrow Money, 82 A.L.R.3d 1116, 1118 (1978)
 
 
 [15]
 See Mehr & Kilgore, Supra note 1, at 1026 (footnotes omitted) ("Since money is considered as a commodity, there is a strong presumption against the uniqueness of the loan commitment, and the availability of substitute performance ordinarily is assumed.")
 
 
 [16]
 See, e. g., Cuna Mut. Ins. Soc'y v. Dominguez, 9 Ariz.App. 172, 450 P.2d 413 (1969); St. Paul at Chase Corp. v. Manufacturers Life Ins. Co., 262 Md. 192, 278 A.2d 12, Cert. denied, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971); Selective Builders, Inc. v. Hudson City Sav. Bank, 137 N.J.Super. 500, 349 A.2d 564 (Ch.Div.1975); Vandeventer v. Dale Constr. Co., 271 Or. 691, 534 P.2d 183 (1975)
 
 
 [17]
 See Draper, supra note 12; Groot, Specific Performance of Contracts to Provide Permanent Financing, 60 Cornell L.Rev. 718, 741-42; Mehr & Kilgore, Supra note 1, at 1037-38
 
 
 [18]
 Selective Builders, Inc. sought specific performance and incidental damages against Hudson City Savings Bank, which had issued a permanent mortgage loan commitment on an apartment complex. Selective Builders requested closing of the loan just before the commitment was to expire, and it was not disputed that at that time minor work amounting to about $20,000 out of the total loan amount of $1,300,000 was unfinished. The Superior Court of New Jersey, Chancery Division, ordered specific performance of the loan and incidental damages. Damages at law were held inadequate because (1) it would be difficult to calculate damages, (2) a damage award would not make plaintiff whole, and (3) the rights of third parties would be prejudiced if only damages were awarded. 137 N.J.Super. at 509, 349 A.2d at 569
 
 
 [19]
 In addition to his conclusions regarding the inadequacy of a remedy at law, See note 18 Supra, Judge Kentz in Selective Builders stated:
 My research does not disclose any authority in New Jersey for or against the specific enforcement of mortgage loan commitment agreements. However, in other jurisdictions it has been held that land is unique and an agreement to lend money by mortgage, like an agreement to buy land, can be specifically enforced.
 
 
 [137]
 N.J.Super. at 508, 349 A.2d at 569
 
 
 [20]
 We attach little credibility to the concern that failure to require the borrower to seek substitute performance in this type of case will significantly relax the requirements for specific performance. It will still be in the borrower's self-interest to refinance through alternative lenders if such are available and if alternative financing plus legal damages are truly sufficient compensation. Mehr & Kilgore, Supra note 1, at 1035 & n. 107
 
 
 [21]
 Fleischer v. James Drug Stores, 1 N.J. 138, 146, 62 A.2d 383, 387 (1948) (quoting Wilson v. Northampton & Banbury Junction Ry. Co., L. R. 9 Ch.App. 279, 284 (1874))
 
 
 [22]
 That First National would be inclined to default on the loan was recognized in the district court's final judgment, ordering First National to turn over title to the property to Commonwealth Federal
 
 
 [23]
 Mehr & Kilgore, Supra note 1, at 1025
 
 
 [24]
 See Draper, Supra note 12, at 434; Mehr & Kilgore, Supra note 1, at 1021 n. 45 ("Since the (permanent) lender is relying upon the operational viability of the project as security for the loan, before issuing the commitment he will study both the marketability of the project and the borrower's general credit rating.")
 
 
 [25]
 See Mehr & Kilgore, Supra note 1, at 1019-20, 1025
 
 
 [26]
 Groot, Supra note 17, at 741 n. 91
 
 
 [27]
 See Four-G Corp. v. Ruta, 56 N.J.Super. 52, 57, 151 A.2d 546, 549 (App.Div.1959)