**FREEMAN HORN, INC., Inelco, Inc., Joseph A. Horn, and Carl D. Freeman, Jr., Appellants,**

v.

**TRUSTMARK NATIONAL BANK and Ralph Germany, Jr., Substitute Trustee, Appellees.**

**No. CIV.A.3:98CV771WS.**

United States District Court, S.D. Mississippi, Jackson Division.

Sept. 16, 1999.

---

Thomas G. Lilly, Joseph P. Wise, Lilly & Wise, Jackson, MS, Carroll H. Ingram, Marcus A. Treadway, III, Ingram & Associates, Hattiesburg, MS, for appellants.

William H. Leech, McGlinchey Stafford, Jackson, MS, for appellee.

Samuel E. Scott, McGlinchey Stafford, Jackson, MS, for Ralph B. Germany, Jr., trustee.

Ronald McAlpin, Assistant U.S. Trustee, Jackson, MS, Pro se.

## ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT

WINGATE, District Judge.

Before the Court is an appeal from Bankruptcy Court brought by Freeman Horn, Inc., Inelco, Inc., Joseph A. Horn, and Carl Freeman, Jr., the appellants in the above-styled and numbered cause. This court's jurisdiction is predicated on the authority to hear such appeals as provided by Title 28 U.S.C. § 158.[1] Appellate procedure is governed by Title 11 U.S.C. Rule 8001(a)[2] and related statutes. Having reviewed the briefs of counsel, the authority and exhibits, and the memorandum Opinion and Order of the Bankruptcy Court, this court finds that the Final Judg-

---

1. Title 28 U.S.C. § 158(a) provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees; (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and (3) with leave of the court, from other interlocutory orders and decrees; and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."

2. Title 11 U.S.C. Rule 8001(a) provides in pertinent part that "[a]n appeal from a final judgment, order or decree of a bankruptcy judge to a district court or bankruptcy appellate panel shall be taken by filing notice of appeal with the clerk within the time allowed by Rule 8002. Failure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for such action as the district court or the bankruptcy appellate panel deems appropriate, which may include dismissal of the appeal."

ment of the Bankruptcy Court should be affirmed.

## I. PERTINENT FACTS ON APPEAL

This appeal from the United States Bankruptcy Court for the Southern District of Mississippi involves the Bankruptcy Court's decision in three adversary actions associated with the bankruptcy cases of *In re Freeman Horn, Inc., and Inelco, Inc.,* Case Nos. 93–01304JC and 93–01305JC. Two of the adversary actions (Nos. 930173 and 930174) present the claims of Freeman Horn, Inc. and Inelco, Inc. (hereinafter Freeman Horn, Inc.) against Trustmark National Bank (hereinafter "Trustmark") and the substituted Trustee for Trustmark's foreclosure Robert Germany, Jr. The third adversary action (No. 940059) involves the claims of Trustmark and the Trustee against Freeman Horn, Inc., Inelco, Inc., Joseph A. Horn, and Carl Freeman, Jr. The pertinent facts are set forth in greater detail in the Memorandum Opinion and Order of the Bankruptcy Court, but a truncated version of the facts and the Bankruptcy Court's findings is set forth herein.

### a. Freeman Horn, Inc., Seeks Refinancing

Joseph A. Horn, and Carl Freeman, Jr., were at all times relevant to this dispute the sole shareholders of Freeman Horn, Inc., and Inelco, Inc.,[3] companies involved in providing electrical work for a primary contractor called Fire Security Services, Inc. In the due course of business, Horn and Freeman personally guaranteed debts incurred by Freeman Horn, Inc., and Inelco, Inc., in excess of $600,000.00, and pledged their personal and real property as collateral to secure these personal guaranties. Thereafter, Freeman Horn, Inc.'s need for operating capital increased, requiring Horn and Freeman either to seek additional financing through Trustmark, or to restructure their current debt.

### b. Trustmark Proposes Restructuring

In late 1992, Horn and Freeman, Jr., approached Nelson E. Gibson, then a Vice President with Trustmark, with their financial dilemma, proposing that Freeman Horn, Inc.'s present $500,000.00 line of credit be restructured and/or refinanced. Gibson proposed that this could be accomplished with a 10–year Small Business Administration (SBA) loan in the amount of $500,000.00 at 8.75% per annum. Gibson also proposed that Freeman Horn, Inc., could receive a new 1–year line of credit in the amount of $250,000.00 to be 70% guaranteed by the SBA at prime + 2.5%. Meanwhile, recognizing that Freeman Horn, Inc., would need additional operating capital immediately, Gibson approved a short term loan in the amount of $200,-000.00 for fifty days which was deposited into the Freeman Horn, Inc., account.

In hope of going forward with Nelson Gibson's proposals, Horn and Freeman submitted three loan applications which contained several conditions required by the SBA and Trustmark before a loan of this nature could be finalized, including an annual financial statement review within 120 days of years end; quarterly statements; monthly cash flow statements; new appraisals of real estate belonging to the customer and the guarantors; and a new loan agreement.

Once the short term $200,000.00 loan was advanced, Freeman Horn, Inc., was indebted to Trustmark in an amount exceeding $750,000.00, including previously existing promissory notes for the amounts of $359,500.00 and $150,000.00, the 50–day short term loan in the amount of $200,-000.00, and another promissory note in the amount of $40,000.00. Additionally, Inelco, Inc., was indebted to Trustmark in the amount of $50,000.00.

### c. The November 11, 1992, Letter

On November 11, 1992, in response to a request of Joseph A. Horn for the benefit of Horn's bonding agent, Trustmark,

---

**3.** Inelco, Inc., was a subsidiary of Freeman Horn, Inc.

through its Vice President Nelson E. Gibson, prepared a short letter stating that Trustmark had approved a line of credit and a term loan as of the date of the letter in the total amount of $750,000.00. This amount already had been advanced to Freeman Horn, Inc., and was not a loan yet to be funded. The letter states as follows:

Dear Mr. Horn,

We are pleased to advise you that Trustmark National Bank has approved both a line of credit and a term loan under the following terms and conditions:

| | |
|---|---|
| BORROWER: | FREEMAN HORN, INC. |
| AMOUNT: | $750,000.00 |
| RATE: | Prevailing Rate |
| TERM: | Line matures annually or as long as financial conditions remain satisfactory to the Bank |
| | Term Loan—5 years |
| GUARANTORS: | Joseph A. Horn<br>Carl D. Freeman |
| COLLATERAL: | Collateral acceptable to Trustmark National Bank |

We appreciate the opportunity to serve Freeman Horn, Inc. And look forward to expanding our relationship. If you have any questions, please do not hesitate to contact me.

Sincerely,

//Nelson E. Gibson//

Trustmark notes that this letter says nothing about any new loans or any agreement to restructure current debt. Instead, says Trustmark, the letter refers only to the amount already approved and funded. Moreover, Trustmark says that such bonding company letters had been provided for Horn in the past, and that this one was the same as the rest.[4] According to Trustmark, this letter simply informs the bonding company of the nature of Trustmark's current banking relationship with Freeman Horn, Inc. No offers are made in this letter, says Trustmark, to restructure Freeman Horn, Inc.'s current debt, with or without SBA backing.

Trustmark, through Nelson Gibson's testimony, noted that this letter was distinguishable from a letter of commitment obligating Trustmark to make a loan because the rate of interest and acceptable collateral were not specified; the conditions required for funding of the loan were not included; the letter was not signed by the customer and the guarantors; no expiration date was specified; and, finally, because the letter clearly was provided for the sole purpose of satisfying a requirement of Horn's bonding company.

### d. Freeman Horn, Inc., Seeks Assistance from Fire Security

When the fifty-day $200,000.00 loan came due, Nelson Gibson notified Horn that a payment of $200,000.00 on Freeman Horn Inc.'s existing loans would be required before the proposed restructuring could go forward. Additionally, Gibson stated that the SBA loan package was not completed because Gibson was waiting for the necessary information to be provided by Horn.

Lacking the funds to make the $200,000.00 payment and still meet payroll and other expenses, Horn and Freeman sought the assistance of their prime contractor Fire Security Systems, Inc., whose principals were William Hayes and Donald Harbin. In January of 1993, Horn met with Gibson, Hayes and Harbin at Trustmark for the purpose of finding a way to reschedule the indebtedness of Freeman Horn, Inc. Fire Security Systems, Inc., agreed to advance Freeman Horn, Inc., $200,000.00 for work already performed or yet to be performed, if Trustmark would assure Fire Security that the proposed restructuring of Freeman Horn, Inc.'s debt would be finalized on the basis of the

---

4. According to the testimony of Chester White, former Vice President with Trustmark who preceded Nelson Gibson, virtually identi-cal letters had been provided for Horn's bonding company in the past.

$200,000.00 payment. Trustmark viewed the $200,000.00 merely as repayment of the 50–day loan, not as new security for a new loan. Moreover, as noted by the Bankruptcy Court, Trustmark already was secured by Freeman Horn, Inc.'s accounts receivable. Freeman Horn, Inc., admits this in its brief to this court, acknowledging that Trustmark needed only to give notice that it required Freeman Horn, Inc.'s accounts receivable as additional security and the accounts would belong to Trustmark.

Hayes and Harbin, Fire Security's principals, questioned Trustmark's reticence to launch immediately into the proposed restructuring of Freeman Horn, Inc.'s debt, claiming to understand that Trustmark already had committed itself to provide a new line of credit pursuant to Nelson Gibson's November 11, 1992, letter. Gibson disagreed, reminding Fire Security that he still was waiting for information required by the SBA to be provided by Freeman Horn, Inc., such as the new financial statement. So, according to Trustmark, no commitment yet had been made, and the November 11, 1992, letter was provided for Horn merely as an accommodation.

### e. Freeman Horn Submits its New Financial Statement

On February 3, 1993, Joseph A. Horn met with Harry Walker, the President of Trustmark, Skip Horne, Trustmark's chief lending officer, and Nelson Gibson to present Freeman Horn, Inc.'s new financial statement, one of the requirements for obtaining SBA backing of the proposed debt restructuring. At this meeting it was discovered that Freeman Horn, Inc.'s net worth had deteriorated significantly, from a positive $184,000.00 to a negative $115,-000.00. Moreover, accounts receivable had decreased by fifty percent. Other items such as decreased billings, increased costs, increased inventory, increased debt and decreased income and liquidity caused Trustmark to conclude that the proposed restructuring of debt set forth in the three aforesaid loan applications submitted by Horn and Freeman was not fundable. Thus, the pending applications for restructuring were rejected by Trustmark, but the current banking relationship between Trustmark and Freeman Horn, Inc., remained undisturbed for the time being.

Trustmark permitted Freeman Horn, Inc., to remain in overdraft in February of 1993. Horn and Freeman renewed Freeman Horn, Inc.'s promissory notes and their respective personal guarantees with Trustmark. However, Freeman Horn, Inc.'s financial situation continued to deteriorate. Trustmark ceased covering overdrafts on the Freeman Horn, Inc., account in March of 1993. Then, on April 19, 1993, Freeman Horn, Inc., and Inelco, Inc., sought the protection of bankruptcy.

## II. FINDINGS AND CONCLUSIONS OF THE BANKRUPTCY COURT

The Bankruptcy Court tried Adversary Nos. 930173, 930174 and 940059 together in December of 1997. Freeman Horn, Inc., and Inelco, Inc., argued that Trustmark had committed itself to restructure Freeman Horn, Inc.'s debt, then reneged on the commitment, thereby forcing Freeman Horn, Inc., and Inelco, Inc., into bankruptcy. This was the crux of the case for Freeman Horn, Inc., and Inelco, Inc. If Nelson E. Gibson's November 11, 1992, letter, prepared for the benefit of Joseph A. Horn's bonding agent, was actually a binding letter of commitment to make the loans in question, and Trustmark refused to honor this commitment, then, argued Freeman Horn, Inc., and Inelco, Inc., Trustmark had breached its duty of good faith and fair dealing, as well as its fiduciary duty; misrepresented, either negligently or intentionally, that it would make the loans in question; committed actual or constructive fraud; interfered with Freeman Horn, Inc.'s ongoing business relations; terminated a long standing financial relationship without notice; and handled Freeman Horn, Inc.'s and Inelco, Inc.'s loans negligently. They also argued that

Trustmark was bound to honor the November 11, 1992, letter under the theory of promissory estoppel.

The Bankruptcy Court rejected all these claims, concluding that Nelson E. Gibson's November 11, 1992, letter was not a letter of commitment or a contract as contended by Freeman Horn, Inc., and Inelco, Inc. The Bankruptcy Court compared Gibson's letter to other bond letters and to other letters of commitment and concluded that the letter was in the form of a standard bonding company letter. The Bankruptcy Court embraced the testimony of Mike Woody, a banking expert, who testified that a commitment letter would be considerably longer, and would include the actual interest rate, closing fees, the terms of repayment, the specific collateral, conditions for funding, an acceptance of its terms by the customer (signature line), and an expiration date. Inasmuch as most, if not all, of these features were not present in the November 11, 1992, letter from Gibson to Horn, the Bankruptcy Court rejected the testimony of Freeman Horn, Inc.'s expert that a commitment letter could take any one of many forms, and that the letter in question should be construed as a commitment letter.[5] Furthermore, the Bankruptcy Court was unpersuaded that the letter constituted a contract inasmuch as the Court was unable to ascertain from the letter that there existed an agreement between the parties as to all material terms. *See J. Russell Flowers, Inc. v. Itel Corporation,* 495 F.Supp. 88, 91 (N.D.Miss. 1980), citing *Betty Lee Shoes, Inc. v. Karl's Shoe Stores, Ltd.,* 293 F.2d 429, 432 (5th Cir.1961) (letter purporting to accept negotiations with respect to lease financing did not constitute an enforceable contract where the terms of alleged agree-ment were not found in the letter and it was shown that parties had not come to a complete agreement as to all terms of contract). The Court also noted the absence of a specific interest rate, no documentation of collateral, and the lack of conditions precedent such as the necessity of meeting the requirements for SBA backing of the new loan arrangement. This requirement that Freeman Horn, Inc., obtain SBA backing for the proposed restructuring of debt, noted the Bankruptcy Court, was acknowledged in testimony by Joseph A. Horn.

Concluding that Nelson Gibson's November 11, 1992, letter did not constitute a commitment letter or an enforceable contract, the Bankruptcy Court rejected the rest of the claims raised by Freeman Horn, Inc., and Inelco, Inc. The Court also found Trustmark's foreclosure and other collection proceedings to be commercially reasonable and rejected Freeman Horn, Inc.'s claim for punitive damages.

### III. *STANDARD OF REVIEW*

■ A Bankruptcy Court's findings of fact are reviewed by this court for clear error while its conclusions of law are reviewed *de novo. Crowell v. Theodore Bender Accounting,* 138 F.3d 1031, 1033 (5th Cir.1998). Rule 8013 of the Federal Bankruptcy Rules of Procedure provides that, "[o]n an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of

---

5. The Bankruptcy Court noted that the primary authority relied upon by Freeman Horn, Inc., and Inelco, Inc., *Sterling Faucet Company v. First Municipal Leasing Corporation,* 716 F.2d 543 (8th Cir.1983), involved a document described by the Eighth Circuit as being "detailed as to the parties, the amount and terms of the loan, and the conditions precedent," and "that there was ample evidence that Sterling had fulfilled the conditions precedent." *Id.,* at 543–44. The Gibson letter in the instant case lacks such detail, and the testimony clearly establishes that Freeman Horn, Inc., did not meet the requirements for an SBA guaranteed loan as contemplated by their loan applications.

the bankruptcy court to judge the credibility of the witnesses." *See Texas Extrusion Corporation v. Lockheed Corporation*, 844 F.2d 1142, 1164 (5th Cir.1988), citing *Amstar Corporation v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); and *Golf City, Inc. v. Wilson Sporting Goods Company, Inc.*, 555 F.2d 426, 434 (5th Cir.1977) (under Bankruptcy Rule 8013, findings of fact made by a bankruptcy judge are not to be set aside unless clearly erroneous). In *Texas Extrusion*, the Fifth Circuit noted that, after review of the bankruptcy court record, it would not determine the bankruptcy court's findings to be clearly erroneous unless the Court was left with "the definite and firm conviction that a mistake had been committed." *Id.*, at 1164.

## IV. *ANALYSIS*

■ A binding loan commitment is a contract between the lender and borrower; therefore, basic contract principles apply (e.g., offer, acceptance, consideration and reliance). *See* Sue P. Murphy, *Structuring Loan Commitments to Avoid Liability*, Practising Law Institute Commercial Law and Practice Course Handbook Series, 526 PLI/Comm 209, 213 (1990). A binding commitment to lend money may be found (I) where a writing exists containing all essential terms of a contract to lend; (ii) where missing terms in a writing are supplied by oral agreement or the actions of the parties; or (iii) where only an oral agreement exists. Because a commitment may be written or oral, all communication between a lender and a borrower should be conducted with care, so the lender can avoid commitments containing terms which are unacceptable or surprising to the lender. *Id.*, at 213.

■ The cases on the subject of what constitutes commitment letters and a bank's liability under them are few in number. Usually, lenders will be held liable

for breach of contract where they have imposed additional conditions not set forth in a commitment letter and then failed to make a loan based on failure of the borrower to fulfill such conditions. *See 999 v. C.I.T. Corp.*, 776 F.2d 866 (9th Cir.1985). There is no evidence in the instant case to support a contention that Trustmark imposed any hidden or surprise conditions on Freeman Horn, Inc.

In *Sterling Faucet Company v. First Municipal Leasing Corporation*, 716 F.2d 543, 544 (8th Cir.1983), a letter which the lender considered to be a mere proposal was held to be a binding commitment. The Eighth Circuit found that the proposal letter contained all the elements of a contract and that the parties intended to be bound thereby. The letter was detailed as to the parties; it contained the principal amount to be loaned;[6] the terms of the loan (term and interest rate) were present; and conditions precedent were stated. Moreover, the letter required that the borrower provide a business plan to the lender and that the documentation be satisfactory to all parties. *See Structuring Loan Commitments to Avoid Liability*, 526 PLI/Comm 209, at 223–24. The letter was sent by the lender's agent and was signed and accepted by the borrower. The lender received a copy of the signed letter, but at no time did the lender attempt to modify the letter or disavow it as a commitment. The lender later refused to provide financing. The Eighth Circuit held that the borrower had complied with the conditions precedent and an enforceable contract existed. Thus, the lender was obligated to evaluate the loan documentation in good faith consistent with the terms of the commitment letter. *Id.*

■ Inasmuch as the elements of a commitment letter noted by the *Sterling* decision are not present in the instant case, this court agrees with the Bankruptcy Court's finding that Nelson E. Gibson's

---

**6.** The November 11, 1992, letter in the instant case states an amount which already had been loaned to Freeman Horn, Inc., not an amount yet to be loaned.

November 11, 1992, letter to Joseph A. Horn was not a commitment letter or a promise to lend new money. Generally, the first step in creating a consensual contract is an offer by one party and acceptance by the other. *See Houston Dairy v. John Hancock Mutual Life Insurance Company*, 643 F.2d 1185, 1186 (5th Cir. 1981) (it is fundamental that a contract is formed only upon acceptance of an offer). Ordinarily, when a lender submits a commitment letter to a borrower, the borrower either executes the letter with the lender or negotiates changes. Then both the lender and borrower execute the revised letter. *Structuring Loan Commitments to Avoid Liability*, 526 PLI/Comm, at 221–22. This serves as proof of an offer and an acceptance, thereby giving rise to a binding agreement. In the instant case, the letter in question is not executed by Freeman Horn, Inc. The Bankruptcy Court found no evidence that any offer to restructure Freeman Horn, Inc.'s debt was accepted by Freeman Horn, Inc., by its signature on the letter or otherwise.

Next, according to the chronology of events set forth in the Bankruptcy Court's Memorandum Opinion, there was no suggestion that the November 11, 1992, letter was a commitment letter or a contract until after Fire Security Systems, Inc., met with Trustmark in January of 1993 in connection with Fire Security's offer to advance Freeman Horn, Inc., $200,000.00 in hope that this would expedite, or at least facilitate, a new loan agreement between Trustmark and Freeman Horn, Inc. Only after Trustmark took the position that Fire Security's gesture would not be viewed as security for a new loan did Fire Security suggest that the November 11, 1992, letter be construed as a binding commitment.

In *Penthouse International v. Dominion Federal Savings & Loan Association*, 855 F.2d 963 (2nd Cir.1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 154 (1989), a case involving a commitment letter consisting of at least 19 detailed paragraphs and numerous conditional provisions, one of the conditions precedent was that a guaranty of the indebtedness be obtained from a government agency. The Second Circuit noted that a party seeking to enforce a contract must establish that all conditions precedent have been fulfilled, and that the burden of proof is on this party. *Id.*, at 979. So, in the instant case, even if the November 11, 1992, letter, together with the three loan applications submitted by Freeman Horn, Inc., could be construed as a contract binding on Trustmark, it is clear that Freeman Horn, Inc., could not show that it either had fulfilled the condition precedent of obtaining SBA backing for the loans, or that it would be able to do so in the future, especially in light of its unfavorable February 3, 1993, report to Trustmark regarding its deteriorated financial condition. *See also Sterling Faucet Company v. First Municipal Leasing Corporation*, 716 F.2d 543, 544 (8th Cir.1983) (finding a valid commitment based on ample evidence that the borrower had fulfilled the conditions precedent to bind the leasing company).

According to learned authority, *see Structuring Loan Commitments to Avoid Liability*, 526 PLI/Comm, at 214, a lender may intend to cause the borrower to commit to borrow funds to insure that its time and expenses will ultimately result in a closed transaction and perhaps to secure fees to cover the lender's expenses if the transaction does not close. *Id.*, at 215. Lenders often require fees for commitment letters and related investigations. *Id.*, at 216. *See First National State Bank v. Commonwealth Savings & Loan Association*, 610 F.2d 164, 167 (3rd Cir. 1979) (where commitment letter required a fee of 1% of the loan amount). No evidence is cited by the Bankruptcy Court in the instant case showing that any fees were charged by Trustmark in exchange for the November 11, 1992, letter. As the Bankruptcy Court noted, Trustmark provided the letter in question at Horn's request to satisfy a bonding company, not to

bind Freeman Horn, Inc., or itself to any new loan arrangement.

Finally, if the November 11, 1992, letter is anything other than a notice to a bonding company of a banking relationship, then it is more in the nature of a "term sheet" than a commitment letter. For instance, prior to executing a commitment letter, a lender usually will produce a "term sheet" identifying basic terms of the transaction which have been agreed upon or which the lender will require. It is not a binding document. The term sheet provides a basis for discussion and ordinarily is not signed by either party. *Structuring Loan Commitments to Avoid Liability,* 526 PLI/Comm, at 217–218. The letter in question has all these features. It leaves for discussion the matters of the interest rate and acceptable collateral, and Freeman Horn, Inc., has not signed the letter, thereby indicating no acceptance of an offer.

### V. CONCLUSION

In light of the foregoing analysis, this court concludes that the purpose of the November 11, 1992, letter when initially requested by Joseph A. Horn was to provide proof of a banking relationship with Trustmark to Freeman Horn, Inc.'s bonding company. There is no appearance from the letter either that Trustmark was attempting to commit itself or Freeman Horn, Inc., to any new lending plan, or that Freeman Horn, Inc., was seeking such a commitment. The testimony relied upon by the Bankruptcy Court supports Trustmark's argument that the letter was provided at Horn's request to present to his bonding company. Consequently, this court rejects Freeman Horn, Inc.'s argument that, as a regular borrower from Trustmark, this continuing relationship, together with the November 11, 1992, letter, obligated Trustmark to go forward with the proposed restructuring of Freeman Horn, Inc.'s debt. The letter simply does not bear the character of a binding letter of commitment.

Furthermore, this court rejects Freeman Horn, Inc.'s contention that the $200,-000.00 advanced by Fire Security Systems, Inc., for a payment on amounts already due and owing was fresh security for the promise of a new loan.

Therefore, this court agrees with the Bankruptcy Court's finding that Trustmark breached no commitment letter or any other promise to lend money. Further, this court agrees with the Bankruptcy Court's decision to dismiss the claims of Freeman Horn, Inc., and Inelco, Inc., against Trustmark based on breach of the duty of good faith and fair dealing, fiduciary duty, misrepresentation, negligence, intentional tort, actual and constructive fraud, interference with ongoing business relations, and promissory estoppel.

Finally, this court agrees with the finding of the Bankruptcy Court that the collection efforts of the Trustee were commercially reasonable. Accordingly, in all respects, this court hereby affirms the Judgment of the Bankruptcy Court.